# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    No.   CR 1:19-03333-001 WJ

MALCOM TORRES,

      Defendant.

### DEFENDANT'S OBJECTIONS TO THE GOVERNMENT'S NOTICE OF INTENTION TO OFFER EXPERT TESTIMONY AND REQUEST FOR DAUBERT HEARING FOR SELECTED EXPERTS

Malcolm Torres, through counsel, objects to the government's expert notice, (Doc. 131) and the proposed testimony of the government's experts. Mr. Torres submits objections to the following expert witnesses identified by the government and requests a *Daubert* hearing as to several of those witnesses.[1]  As grounds, Mr. Torres states:

---

[1] Mr. Torres has submitted under separate cover an objection to the government's CAST experts Russell Romero and Sean MacManus.

I       **Background**

Mr. Torres is charged with a four-count indictment. Count one charges

him with first-degree murder contrary to 18 U.S.C. § 1111. Count two charges

him with second-degree murder, contrary to 18 U.S.C. § 1111. Count three

charges him with assault resulting in serious bodily injury contrary to 18 U.S.C. §

1152.   Count four charges Mr. Torres with tampering with a witness, victim, or

an informant contrary to 18 U.S.C. § 1512(c)(2). Trial is currently scheduled for

May 15, 2023.

Pursuant to the scheduling order the expert notice was filed on January 16,

2023 and after extensions, counsel for the Defendant hereby lodges his objections

prior to the current deadline of March 3, 2023 (Doc. 148).

II      **Discussion**

A.      *Objections to the sufficiency of the government's expert notice.*

The recently amended Federal Rule of Criminal Procedure 16(a)(1)(G)

requires the government to disclose to the defendant, at the defendant's request,

a complete statement of all opinions that the government will elicit from the

witness in its case- in-chief, or during its rebuttal to counter testimony that the

defendant has timely disclosed under (b)(1)(C); the bases and reasons for them;

the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous four years, the witness has testified as an expert at trial or by deposition. The Defense, via the standard discovery order as well as emails with opposing counsel have requested proper expert notice under the new Rule 16.   Therefore, the government's obligations under that Rule have been triggered.

Rule 16 is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."   *United States v. Hoffecker*, 530 F.3d 137, 184 (3rd Cir. 2008) (quoting Fed. R. Crim. P. 16, 1993 Adv. Committee Notes). The rule "is designed to give opposing counsel notice that expert testimony will be presented, permitting 'more complete pretrial preparation,' . . . such as lining up an opposing expert, preparing for cross-examination, or challenging the admissibility on *Daubert* or other grounds."   *United States v. Nacchio*, 519 F.3d 1140, 1151 (10th Cir. 2008) (quoting Fed. R. Crim. P. 16, 1993 Advisory Committee Notes).

This Court has the authority to exclude expert witness testimony as a sanction for failure to comply with Rule 16's expert witness disclosure requirements, including for the failure to comply with those requirements in a timely fashion. *Hoffecker*, 530 F.3d at 185; Fed. R. Crim. P. 16(d)(2)(C).

Several parts of the government's notice of expert testimony fails to comply with Rule 16(a)(1)(G) because they fail to set out a *complete statement of all opinions that the government will elicit from the witness in its case- in-chief* and the *bases and reasons for those opinions*.

### 1      Objection to Lara Adams

The government's notice as to Lara Adams provides that "Ms. Adams' report . . . details the items she tested, the results she obtained (including statistical analysis), the underlying raw data, and the methods that she employed to obtain those results . . ." Even if Ms. Adams' report is incorporated by reference into the government's notice, that report fails to provide a complete statement of all the opinions the government will elicit from the witness and the bases of those opinions.

### 2  *Objection to Shannon Prince*

The government's notice regarding its witness Shannon Prince similarly fails to comply with Rule 16. The government's notice does incorporate by reference Shannon Prince's report. The government's notice states that the "United States intends to introduce all of the conclusions reflected in the report, most notably the results obtained from Items 77, 79, and 80." (Doc. 131).   The defense seeks to make clear for the record that these three items were only fingerprints that appear to have been obtained from any of the items. The defense objects to any testimony beyond that related to the three items identified in the government's expert notice.

### 3  *Objection to Brian McVickers*

Brian McVickers is a forensic footwear and tire examiner. The government's expert notice fails to provide sufficient notice as to the conclusions that Mr. McVickers reached or the scope of his proposed testimony at trial. This is problematic given that his report—a 98-page document—contains a number of observations and concludes that two shoe print impressions – Patterns D and E – were inconclusive as to a comparison with Items 25, 26 and 69, two pairs of boots associated with Mr. Torres. The government does not set out, in light of these

inconclusive findings, what Mr. McVickers' testimony would be as to the shoe print evidence.

The government's notice regarding the tire print evidence is similarly insufficient. The government provides no description of what Mr. McVicker's testimony would be regarding the tire print evidence. Mr. McVicker's report, provides that one of the cars tested, the Kia Sportage, could be excluded from as a source of the tire impression. The report provides that the comparison of the Ford truck with the tire impressions is inconclusive. In light of the inconclusive nature of the findings, it is difficult to ascertain, from the report, what Mr. McVickers' "conclusions" would be at trial or the substance of his proposed testimony.

**B.      Objection to the government's experts for lack of relevance reliability, prejudice and request for a Daubert hearing**

Mr. Torres specifically objects to the testimony of Dr. Cline-Parhamovich, Michelle Martin, Lara Adams, Ian Saginor, Dr. Shalon Nienow, Brian McVicker, Ashley Baloga, and an expert on land status on the ground that this testimony does not meet the requirements of Rule 702 and cannot survive scrutiny under the analysis set out in *Daubert*. This testimony is not relevant and, to the extent it is relevant, is not reliable. In some instances it is highly prejudicial. Mr. Torres

specifically moves for a Daubert hearing on each of these experts to determine whether the proposed testimony is admissible to any extent under Rule 702.

The admission of expert testimony is governed by Rule 702. In evaluating the evidence the court must serve as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Under Rule 702, the test for relevance, "is whether the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quotations and citation omitted). In determining if the evidence will assist the trier of fact the court considers a set of "nonexclusive" factors: "(1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility". *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (footnotes omitted).

If the court finds the expert testimony is relevant it must then determine if it is reliable by applying another set of "non-exclusive" factors: "(1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or

potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community." *Id*. This analysis applies to all expert testimony offered under Rule 702 – even if the evidence "is not purely scientific." *United States v. Medina-Copete*, 757 F.3d 1092, 1101 (10th Cir. 2014). If the court finds the evidence is both relevant and reliable then it is properly admissible under Rule 702.

As the proponent, the Government bears the burden of showing by a preponderance of the evidence that the proposed expert testimony is admissible. *Squires v. Goodwin*, 829 F.Supp.2d 1041, 1048 (D. Colo. 2011); *United States v. Gutierrez-Castro*, 805 F.Supp.2d 1218, 1225 (D.N.M. 2011). The Government must show: (1) the expert has the "knowledge, skill, experience, training or education" to render a *qualified* opinion on the facts of this case; and (2) that the expert's opinions are "reliable" under the principles of *Daubert*. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001); Fed. R. Evid. 702. In *Daubert*, "the Supreme Court announced four factors for a trial judge to consider in assessing the relevance and reliability of evidence under Rule 702: testing, peer review, error rates, and general acceptance." *Perrault*, 2019 WL 1024284, at *3 (quoting

*Daubert*, 509 U.S. 579). In addition to demonstrating the reliability of the principles, the government must also show that those principles and methods were reliably applied to the fact of the case. Fed. R. Evid. 702.

The Government has not satisfied these foundational requirements as they pertain to the government's proposed experts. Unless and until the Government proves otherwise at a *Daubert* hearing, the testimony is inadmissible.

**1      *Objection to Dr. Karen Cline-Parhamovich.***

Mr. Torres objects to the testimony of Dr. Cline-Parhamovich to the extent that testimony, as noticed by the government, seeks to discuss the "results of the sexual assault examination conducted on Jane Doe . . ." (Doc. 131 at 3). It is unclear why this testimony is sought, given that Dr. Cline-Parhamovich's report specifies that a sexual assault examination kit to collect DNA evidence was performed and that there was "no evidence of trauma to the genital region, neither vaginal nor rectal." Any testimony related to the sexual assault examination kit is irrelevant and prejudicial. The defense objects to the proposed testimony of Dr. Cline-Parhamovich to the extent that testimony relates to the Sexual Assault Examination Kit.

### 2     *Objections to Michelle Martin*

The Government has identified Michelle Martin as a forensic DNA examiner employed by the FBI. Mr. Torres objects to Michelle Martin's testimony to the extent that such testimony seeks to introduce any evidence that the government has sought to introduce pursuant to Rule 404(b). (Doc. 133 at 10). As discussed in the defense's response to the government's Rule 404(b) notice, such evidence is not relevant, does not fall within a recognized basis for inclusion under Rule 404(b), and is highly prejudicial. (Doc. 142). Mr. Torres objects to any testimony from Dr. Michelle Martin that seeks to inquire into such topics.

### 3     *Objections to Lara Adams*

Mr. Torres objects to the relevancy of Lara Adams' testimony. The government's notice states that Ms. Adams will testify about testing she conducted on various items of evidence that law enforcement recovered during the investigation of this case. Ms. Adams' report that details the items she tested, the results she obtained (including the statistical analysis), the underlying raw data, and the methods that she employed to obtain those results have been previously disclosed to the Defendant (Bates 022222 - 022652). Ms. Adams will also testify about the methods and protocols employed by the FBI lab during the

course of the analysis. (Doc. 131). If this is the extent of Ms. Adams' testimony,

then the defense objects on relevancy grounds given that the government's notice

does not indicate that she will testify as to any conclusions. The government's

notice fails to state that Ms. Adams will testify at all about the conclusions

reached in either of her two reports.

  To the extent that the government intends to seek testimony regarding any

conclusions Ms. Adams' reached in her report, the defense objects to those

conclusions on relevancy grounds. None of the conclusions reached in the report

have, given the limited and sparce data available from the conclusions, any

relevancy in this case. For example, in the August 3, 2021 report, a DNA test of a

root from hair obtained from an item found at the Rio Grande River in Espanola

yielded results that Ms. Adams concluded were "2 times more likely if [R.C.] is a

contributor than if an unknown, unrelated person is a contributor." There are

two critical parts of this statement. First, a likelihood ratio of 2 is at the extreme

low end of the likelihood ratio for a conclusion that there is "limited support for

inclusion." Second, this "likelihood ratio" applies only if an "unknown,

unrelated person" is not the contributor. Ms. Adams does not analyze this in the

context of the Santa Clara Pueblo, where there may be any number of people

who were related to R.C. Without that critical part of an analysis, the conclusion of "limited support for inclusion" lacks any relevance to this case and is far more prejudicial than probative. To the extent such evidence is relevant the minimal probative value of such evidence is substantially outweighed by the danger of unfair prejudice and misleading the jury.

### 4       Objection to Soil Examiner Ian Saginor

Ian Saginor is expected to testify that soil found near the location the government believes R.C.'s body was placed in the river matches the soil found on Mr. Torres' boots and clothing. The government's expert notice states that "Mr. Saginor will testify that soil recovered from the debris of the Defendant's pants (Item 21) cannot be differentiated from the soil near the Rio Grande River (Items 44, 45, and 46). Soil recovered from the debris of the Defendant's pants (Item 21) is different than the soil recovered from the Rio Grande River as represented by Items 47 and 48, the residence at 1046 Arch Lane . . . and the tire tracks on Waters Edge Ditch Road . . ." (Doc. 131 at 7).

Such evidence does not survive scrutiny under Rule 702 and *Daubert*. The test for relevance under Rule 702, "is whether the evidence or testimony [will] assist the trier of fact to understand the evidence or to determine a fact in issue."

*United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004). In determining if the evidence will assist the trier of fact the court considers a set of "nonexclusive" factors: "(1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility."

The only connection between the purported experts' findings is that soil allegedly found at the Rio Grande River ***cannot be differentiated from*** soil found on Mr. Torres' pants. Such a thin conclusion renders this proposed evidence irrelevant. Additionally, to the extent it is relevant, such relevance is substantially outweighed by the danger of unfair prejudice and confusion of the issues. This is highlighted by the second statement in Ian Saginor's report, where he states that "the area near the Rio Grande River as represented by Items 44, 45, and 46 cannot be eliminated as a possible source of the soil from the debris from the pants from Malcolm Rudolfo Torres." To the extent such evidence is relevant, the probative value is exceedingly thin, and the danger that such a statement will confuse or mislead the jury is high.

In addition to the relevancy problems inherent in the proposed testimony of Ian Saginor, there are a number of reliability issues inherent in this testimony.

13

Mr. Saginor compared soil from Mr. Torres' boots and jeans with soil from an area near the Rio Grande river. He states in his report that "Soil recovered from the debris from the pants from Malcolm Rudolfo Torres . . . lacks the larger pebbles that were found in soil from the area near the Rio Grande River as represented by Items 44, 45, and 46." Mr. Saginor modified the soil to account for this difference, and stated that a "comparison between soil recovered from the debris from the pants from [Mr. Torres] soil from the area near the Rio Grande River [Items 44-46] was performed on grain size fractions that were sieved to be of similar size . . ."

In light of the modification of the soil sample from the Rio Grande River, the comparison test performed by Mr. Saginor is not reliable and fails to pass scrutiny under *Daubert*.

- ***Not quantifiable or testable***: Ian Saginor's report states that "Item 21 has a grain size distribution that is skewed to fine-medium sand sized particles relative to Items 44-46. Differences in grain size distribution between questioned and exemplar samples in unconsolidated materials may be attributed to transfer ***or may reflect genuine differences in sources***." This is entirely speculative and reflects that the sample of soil

from Mr. Torres' jeans was modified to mirror the particle size of the soil sample from the Rio Grande. Given this alteration in the substance being examined, there is no quantifiable method of ascertaining whether the soil sample differences may be attributed to "transfer" or whether they "reflect genuine differences in sources."

- *Not falsifiable*: Because the soil sample from Mr. Torres' pants was altered, there is no way to test whether the difference is from the transfer or a genuine difference in sources.

- *No known rate of error*: Given the central uncertainty due to the altered soil sample, there is no established rate of error between when a difference arises due to transfer compared with a genuine difference in source.

- *No generally accepted standard*: Similarly, there is no generally accepted standard for comparison between soil samples when one is sieved to be of similar size to the other.

### 5     *Objection to Dr. Shalon Nienow*

Mr. Torres objects to any testimony from Dr. Shalon Nienow on three grounds. First, Dr. Nienow, as her CV indicates, has only been qualified as an

expert in state courts in Texas and New Mexico. While she has testified in 87

trials in state court, she has never been qualified as an expert in federal court. Mr.

Torres objects to Dr. Nienow's qualifications and to her testimony under Rule

702 and requests a *Daubert* hearing.

Second, Dr. Nienow did not perform an independent examination of R.C.

Her conclusions are based on her review of the report of the Office of Medical

Investigator and the unsubstantiated claims, many of them unsubstantiated, in

the police record. Having reviewed the medical records, the police reports,

statements of others, she was not an "unbiased" examiner. The evidence of R.C.'s

"injuries" should come directly from the medical examiner, the doctors, and the

investigators. It should not be filtered through the testimony of Dr. Nienow, who

will effectively be vouching for other witnesses. Dr. Nienow's conclusions, based

on being drawn from the statements and work of others, are pure speculation.

Her conclusion regarding R.C.'s alleged brain injury illustrates this speculation.

Dr. Nienow states that "[i]n the absence of a reasonable explanatory trauma

history the totality of these findings is diagnostic of physical abuse." This

statement recognizes that there is a possible "trauma history" that would

provide a reasonable explanation of the injuries. But, according to Dr. Nienow, in

the absence of this the findings are "diagnostic of child abuse." This is seeking to bring before the jury an "expert" who is collating all of the evidence to present to the jury the government's theory of the case. This is not expert testimony; it is a voice-piece for the government masquerading under the guise of expert testimony.

Third, for similar reasons, Dr. Nienow's testimony is not reliable. Faced with R.C.'s brain injury, Dr. Nienow states in her report that "[i]n the absence of a reasonable explanatory trauma history the totality of these findings is diagnostic of physical abuse." There is nothing in Dr. Nienow's report that explains the theories or research that supports this conclusion. There is no way to know what this conclusion is based on or whether the reasoning or methodology supporting that conclusion is scientifically valid or properly applied to the facts of this case. Moreover, the conclusory clause "diagnostic of child abuse" is inconsistent with the preceding phrase "in the absence of explanatory trauma history." This inconsistency illustrates that the conclusion that these injuries are "diagnostic of child abuse" is not a scientific conclusion but one born of the absence of evidence. In this, such a conclusion invades the province of the jury

and seeks to usurp, through expert testimony, a question that is committed solely to the jury.

### 5     Objection to Ashley Baloga

The government has provided notice that Ashley Baloga will testify that "multiple head hairs and head hair portions that exhibit characteristics predominantly of European ancestry recovered from items found on debris located on the Rio Grande riverbank are microscopically consistent with hairs from Jane Doe." (Doc. 131 at 12). Additionally, Ms. Baloga will testify that "no hairs microscopically dissimilar to Jane Doe's hair were found on a shirt and underwear submitted to the lab." *Id.* Lastly, Ms. Baloga will also testify that hairs recovered from a dress recovered from the rear driver's floorboard of a 1994 Ford F-250 exhibit characteristics predominantly of European ancestry and are microscopically consistent with the hair samples from Jane Doe." *Id.*

Mr. Torres objects to this testimony on relevancy grounds. Without a standard of comparison, this testimony is not relevant. There is no indication in the expert report of the number of people in the United States may also have hair that is not dissimilar to Jane Doe's or to the hair recovered from items found on the Rio Grande Riverbank.

Additionally, this evidence is deeply unreliable. Hair analysis is an evolving body of science that has not been sufficiently tested, that has not been subject to adequate peer review, and for which there is no known or potential rate of error. Nat'l. Acad. Sci., *Strengthening Forensic Science in the United States: A Path Forward* (hereinafter NAS Report) at 161. The past five decades have seen a number of exonerations of individuals proven innocent through DNA testing. Of the 300 cases identified by the National Association of Criminal Defense Lawyers, in "almost a quarter of the DNA exonerations (just over 70 defendants), the prosecution used hair microscopy evidence to link the defendant to the crime." *See* Microscopic Hair Comparison Analysis, available at

http://www.nacd.org/Landing/Microscopic-Hair-Comparison-Analysis.

The limited reliability of microscopic hair comparison derives from the lack of a known pool of subjects with the same hair characteristics. An article in the journal SIGNIFICANCE notes that a crucial limitation of microscopic hair analysis is that "there are no population-based databases that contain subject's hair characteristics, making it impossible to estimate the probability of any given hair characteristic." *Flawed Forensics: Statistical failings of microscopic hair analysis*, SIGNIFICANCE, by Jim Norton, et. al. April 8, 2016.

The FBI has itself admitted flaws in its microscopic hair comparison unit and in 2015 "formally acknowledged that nearly every examiner in an elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence against criminal defendants over more than a two-decade period before 2000." *FBI admits flaws in hair analysis over decades*, Washington Post, by Spencer S. Hsu, April 18, 2015. Lastly, a study funded by the Department of Justice observed that with regard to hair comparison analysis, "[n]o scientifically accepted statistics exists about the frequency with which particular characteristics of hair are distributed in the population. There appear to be no uniform standards on the number of features on which hairs must agree before an examiner may declare a 'match.'" NAS Report at 160.

The microscopic hair comparison offered by the government fails each prong of the Daubert test:

- ***It is not quantifiable or testable***: Ms. Baloga's conclusion is a purely subjective statement that two objects have similar visual characteristics. That conclusion is unquantifiable and leaves the court without any verifiable way of determining the reliability of the examiner's analysis.

- ***It is not falsifiable***: Although mitochondrial DNA testing was done, that testing yielded, as discussed above, limited support for inclusion (likelihood ratio of 2) which raises significant risks that another person was the source of the hair.

- ***Not peer reviewed***: As the NAS report documents, microscopic hair analysis as a scientific technique has not been vetted through peer-reviewed scientific publications.

- ***No known rate of error***: There is no established rate of error. The FBI's own report entitled "Microscopy of Hair Part 1: A Practical Guide and Manual for Human Hairs (Jan. 2004) (hereinafter FBI Guide) states that "It has been found that when two hair samples are randomly selected from different individuals and compared microscopically, it is very unusual that they cannot be distinguished. However, the possibility cannot be dismissed that there may be two hair samples whose ranges of variation overlap and distinguishing between the samples is not possible." That is an admission that there is no known rate of error. In fact, in the years since that statement was made in 2004, numerous exonerations through the use of DNA

evidence have demonstrated that the error rate is higher than even the FBI admitted.

- ***No standards***: There are no generally accepted standards for hair comparison. The FBI's guide states there are not a set number of characteristics an examiner must consider and "there is no criterion for the importance assigned to a particular characteristic [in a comparison]." FBI Guide at "Comparison Characteristics." Additionally, while "Microscopy and mtDNA analysis can be used in tandem and may add to one another's value for classifying a common source, [] no studies have been performed specifically to quantify the reliability of their joint use." NAS Report at 161.

- ***Not accepted in the scientific community***: The NAS report concluded that hair comparison "cannot uniquely identify one person." NAS report at 161.

### 6    *Objection to land status expert*

Any expert called to testify about land status is not an expert witness. They are merely a fact witness. The issue of land status is an element of the offense and within the purview of the jury.

## CONCLUSION

For the reasons stated above, defendant Malcolm Torres objects to the sufficiency of the government's expert notice and objects to the government's expert witnesses and requests that the Court hold a *Daubert* hearing on these issues.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas Blvd., NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
(505) 346-2494 Fax
aric_elsenheimer@fd.org
buck_glanz@fd.org

***Electronically filed March 3, 2023***
/s/ Buck Glanz
/s/ Aric G. Elsenheimer
Assistant Federal Public Defenders
Attorneys for Malcolm Torres