IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**MALCOLM TORRES**, )<br>)<br>)<br>Defendant. ) | CRIMINAL NO. 19-CR-03333-WJ |

UNITED STATES' RESPONSE TO DEFENDANT'S
MOTION TO STRIKE SENTENCING ENHANCEMENT
UNDER 18 U.S.C. § 3559(f) IN COUNT 2 OF THE INDICTMENT

The United States of America responds to the Defendant's *Motion to Strike Sentencing Enhancement Under 18 U.S.C. § 3559(f) in Count 2 of the Indictment* (Doc. 149; filed on 2/27/23) as follows.

**PROCEDURAL HISTORY**

On February 23, 2023, the federal grand jury returned a four-count superseding indictment that charged the Defendant with first degree felony murder (count 1), second degree murder of a child (count 2), assault resulting in serious bodily injury of a child under the age of 18 (count 3), and tampering with a witness, victim, and informant (count 4). The indictment attaches a sentencing enhancement to count 2 that is the subject of the instant motion. Specifically, count 2 refers to 18 U.S.C. § 3559(f)(1), which applies when "the crime of violence is murder" and the victim is under the age of eighteen. In that instance, the enhancement imposes a mandatory minimum of 30 years imprisonment, or, alternatively, a mandatory life

sentence if the circumstances satisfy any of the subparagraphs (A) through (D) of 18 U.S.C. § 3591(a)(2).

In his motion, the Defendant takes aim at this enhancement. Relying on *Borden v. United States*, 141 S.Ct. 1817 (2021), the Defendant argues that second degree murder is not a "crime of violence," therefore the sentencing enhancement is inapplicable. He is wrong, and the United States requests that this Court follow the lead of the other circuit and district courts that have found that second degree murder remains a crime of violence in a post-*Borden* world. See *United States v. Begay*, 33 F.4th 1081 (9th Cir. 2022); *United States v. Kepler*, 2021 U.S. Dist. LEXIS 167737 (N. Dist. Okla., Sept. 3, 2021; Judge Frizzell); *Janis v. United States*, 2022 U.S. Dist. LEXIS 86034 (D.S.D., May 12, 2022; Judge Kornmann)

**FACTS**

On Sunday, September 8, 2019, at approximately 6:00pm, the Defendant's grandparents, who lived with the Defendant on the Santa Clara Pueblo, arrived home from out-of-state travel. Upon their arrival, the Defendant told them that his five-year-old stepdaughter, Jane Doe, had been missing since 9:30am that morning. Stunned that the Defendant had not alerted authorities that a five-year-old girl had vanished, the Defendant's grandmother immediately alerted Jane Doe's mother, V.M., who subsequently and sensibly called the police. Torres left his house and was found by police in his white Ford F-250 truck at approximately 8:00pm. He there and then was arrested on unrelated state warrants for probation violations.

On September 11, 2019, at approximately 12:00pm, law enforcement located Jane Doe's lifeless body in the Rio Grande River on the Santa Clara Pueblo. According to the autopsy report, Jane Doe did not drown, but died from blunt force trauma to the front/right side of her

head.  The force did not fracture Jane Doe's skull but led to something called an uncal herniation, which is a type of transtentorial herniation where the innermost part of the temporal lobe of brain  heads for the tentorium and eventually puts pressure on the midbrain (upper brainstem) and the oculomotor nerve. Ultimately the uncal herniation created a subdural hematoma (when blood collects on the brain's surface beneath the skull) and/or swelling (cerebral edema) on the opposite back/left side of Jane Doe's head.  More plainly stated, during a subdural hematoma blood fills the skull very rapidly, building in pressure and compressing brain tissue.  When the brain is compressed, it damages the tissue leading to brain injury and even death.  In addition, Jane Doe had a premortem broken wrist and several premortem bruises on the back of her head and elsewhere on her body indicative of multiple, separate impacts to her body.

Expert testimony at trial will establish that the type and volume of injuries to Jan Doe's body were consistent with child abuse.  That testimony will likewise establish that Jane Doe's injuries were  not consistent with a medical event or an accidental fall.  There was no medical evidence of a seizure or aneurysm.  Also, the forensic pathologist observed no other signs of illness that would have triggered a seizure or aneurysm.  Further, the force necessary to cause the injury to Jane Doe's head was significant and would have had to be more than Jane Doe falling and hitting her head (including rolling off a bed).  There is no evidence that Jane Doe was alive when she was thrown into the river.

At the time of her death, Jane Doe had been in the care of the Defendant, who was her stepfather and with whom he shared custody with V.M.  During the intense investigation of this case, investigators learned that the Defendant had physical custody of Jane Doe for the week

preceding the murder. During that time, multiple individuals observed Jane Doe at the Defendant's home, and none reported witnessing any injuries on the child. The last person to see Jane Doe alive (other than the Defendant) was A.M., who is a friend of the Defendant. She was at the Defendant's home on Saturday, September 7, 2019, between 3:30pm and 5:00pm, and she observed Jane Doe and her 18-month-old brother playing. A.M. stated that Torres was hungover and drinking while she was there, and she left because the Defendant was falling asleep. When she left, the Defendant was the only adult in the home.

Several hours after A.M. left, at around midnight, the Defendant sent a Facebook Messenger message to his friend, S.B., stating "Bro I need your help like now." S.B. did not respond back to the Defendant until later Sunday morning, September 8, 2019, at approximately 8:30am, when he asked what happened. The Defendant responded by text message to S.B. that everything was okay.

On Sunday, September 8, 2019, the Defendant met A.B. at the Santa Clara Smoke Shop. The Defendant's neighbor had a surveillance system that captured the Defendant leaving his home at approximately 9:31am. He was wearing a black t-shirt and drove a grey Kia sport utility vehicle (SUV). When he arrived at the Smoke Shop, the Defendant remained in the driver's side of the vehicle and requested that A.B. purchase alcohol from the store because the Defendant did not have a driver's license. The Defendant's 18-month-old son was in the vehicle, but Jane Doe was not. A.B. purchased a "sleeve" of miniature alcohol bottles for the Defendant and gave it to him. The Defendant and A.B. separately left the area. The Defendant returned to his home and his cell phone registered as being at the home from 10:09am until 11:32am. A.B. went to Walmart and later met with the Defendant that morning at the Defendant's home from

4

approximately 10:30am until 11:20am. A.B. saw the eighteen-month-old boy in the home but did not see Jane Doe.

The Defendant's phone left his home at 11:32am that same day. A review of security camera footage at the Santa Clara Travel Center identified the Defendant and his eighteen-month-old son at approximately 11:45am on Sunday, September 8, 2019. The Defendant's cell phone records corroborate the surveillance video and place him at the travel center from 11:43am until 11:49am. While there, the Defendant purchased gas and candy suckers for his son. From 11:49am until 11:55am, the Defendant drove from the travel center to the Rio Grande River and parked at the riverbank. The Defendant was at the river from 11:55am until 12:03pm. Police later searched this location and found, among other things, alcohol bottles that match the ones that A.B. had purchased for the Defendant. Additionally, a candy sucker wrapper was also located, which was consistent with what the Defendant had purchased for his son at the travel center. This riverbank location is approximately 5.5 miles from Torres' home, and V.M. confirmed that the Defendant is familiar with that location, having taken the family there on prior occasions to play and swim. This riverbank location is approximately 1.5 miles from where Jane Doe's body was found downstream on Wednesday, September 11, 2019.

At 12:13pm, after the Defendant had deposited Jane Doe in the river, he sent a message to A.B. indicating that he was almost back to his home. At about that same time on Sunday, September 8, 2019, A.B. arrived at the Defendant's home bringing more alcohol. The Defendant and the children were not there when A.B. arrived. A.B. waited a short time and the Defendant arrived with his son at approximately 12:21pm. Jane Doe was not with him. The Defendant had dirt or sand on his forehead. While A.B. was visiting, the Defendant was rambling, making

statements like, "she's gone." Additionally, the Defendant mentioned "Santa Clara" and a river. The Defendant told A.B. that Jane Doe had fallen from her bed, hit her head, and possibly had a seizure. The Defendant further told A.B. that Jane Doe had seemed alright initially after the fall, but later she died. The Defendant claimed he had panicked and dumped her body in the river.

A few minutes later, at approximately 1:18pm, the Defendant initiated a series of messages to his friend S.B., the same person he had texted at around midnight asking for help, indicating that the Defendant needed to talk about his daughter. Later that afternoon, the Defendant and S.B. spoke on the phone, where the Defendant told S.B. that Jane Doe died from a brain aneurysm and bleeding from the mouth. The Defendant also told S.B. that the DeVargas Funeral Home had picked up Jane Doe's body, which of course was a lie. At approximately 5:41pm, the Defendant sent S.B. a message instructing him to "tell no one yet."

Soon thereafter, the Defendant's grandparents arrived home, which initiated law enforcement's involvement in the murder. After the Defendant's arrest on Sunday evening, he was interviewed by New Mexico State Police and he provided numerous conflicting statements about what had happened to Jane Doe. The Defendant said that while he was watching TV with his son on Sunday, September 8, 2019, at 9:00am, he watched Jane Doe leave out the front door. She was smiling. According to the Defendant's account, this was the last time he saw her, though he later recalled making her lunch. He added that Jane Doe had been home at the time of S.B.'s visit, which contradicted S.B.'s statement to police as well as the Defendant's claim that he last saw Jane Doe at 9:00am. While watching police search areas near his home, the Defendant said that they were wasting their time, and repeatedly said that Jane Doe was not in

that area. On that point, he was telling the truth because, at that moment, the Defendant was the sole person on earth who knew that Jane Doe was in the river.

Subsequent DNA analysis confirmed that Jane Doe's blood was located on the carpet on the rear passenger floorboard of the Defendant's Ford F-250. DNA from Torres and Jane Doe was found on the neck and underarms of a dress recovered from the rear driver's side floorboard of Torres' Ford F-250, which was near the blood as well. This dress was described as blue with a pink fabric flower on the front, size 5T.

## ARGUMENT

### A. Second-degree murder remains a crime of violence, even after Borden.

In *Borden v. United States*, the Supreme Court considered an issue left open by prior decisions—whether a crime that "requires only a mens rea of recklessness" can qualify as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." 141 S.Ct. 1817, 1821-22. *Borden* has no effect on the validity of enhancement at issue here because it concerns only crimes of ordinary recklessness, explicitly declining to address crimes, like second degree murder, which require "mental states (often called 'depraved heart' or 'extreme recklessness') between recklessness and knowledge." See *Borden* at 1825 n.4. Thus, Justice Kagan's plurality opinion was limited to ordinary recklessness—a "less culpable mental state" than purpose or knowledge. *Id.* at 1824.

Notably, the Borden plurality declined to address crimes like second degree murder that have "mental states between recklessness and knowledge," such as "extreme recklessness" or "depraved heart." *Id*. at 1825 n.4. Justice Kavanaugh, in dissent, confirmed that the plurality's opinion should not be construed to express any view on the application of the use-of-force clause

7

to crimes requiring a mental state of extreme recklessness." *Id*. at 1856 n. 21 (Kavanaugh, J., dissenting). In fact, he noted, "crimes committed with extreme recklessness, such as depraved heart murder, should obviously still qualify as predicate offenses under the ACCA, even after today's decision." *Id*.

With that legal backdrop, the Court must only consider whether second degree murder requires simple "ordinary recklessness," or something more.  If it is the former then second degree murder is not a crime of violence and, consequently, the 18 U.S.C. § 3559(f)(1) enhancement does not apply.  But, if is the latter then the Defendant will be subjected to the enhancement if the jury returns a guilty verdict on count two.

Federal second degree murder is any unlawful killing of a person with malice aforethought that does not qualify as first-degree murder. See *United States v. Pearson*, 203 F.3d 1243, 1271 (10th Cir. 2000). "Second-degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent to do serious bodily injury; (3) a depraved-heart; or (4) commission of a felony when the crime does not fall under the first-degree murder paragraph of § 1111(a)." *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000) (quoting *Pearson* at 1271).

Even assuming each of these alternatives constitute means of demonstrating malice aforethought, rather than alternative elements for second degree murder, see *Sarracino v. United States*, 2017 WL 3822741 at *6 (D.N.M. Aug. 30, 2017) (noting that *Chanthandara* defines only two elements of second-degree murder, and thus declining to apply the modified categorical approach), each nonetheless remains a crime of violence after *Borden*. First, either intent to kill or intent to do serious bodily injury necessarily require the use of physical force. *United States v.*

8

*Castleman*, 572 U.S. 157, 170 (2014) ("It is impossible to cause bodily injury without applying force in the common-law sense."). Thus, this Court's analysis should focus on the depraved heart and felony murder varieties of second degree murder.

> B. *Depraved-heart murder involves recklessness that can fairly be assimilated to purpose or knowledge and therefore requires the use of force against another.*

Depraved-heart murder requires more than the ordinary recklessness addressed in *Borden*. "Second-degree murder involves reckless and wanton disregard for human life that is extreme in nature." *United States v. Brown*, 287 F.3d 965, 975 (10th Cir. 2002); see also *United States v. Visinaiz*, 428 F.3d 1300, 1310 (10th Cir. 2005) (finding "no error" in jury instruction that malice aforethought may be proven "by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that the jury is warranted in inferring that the defendant was aware of the serious risk of death or serious bodily harm."). In contrast, "involuntary manslaughter involves reckless and wanton disregard that is not extreme in nature." *Brown* at 975.

Because it involves a degree of recklessness that manifests an extreme disregard for human life, second-degree depraved-heart murder qualifies as a crime of violence under § 924(c)(3)(A). See *Borden* at 1856 n. 21 (Kavanaugh, J., dissenting); *United States v. Baez-Martinez*, 950 F.3d 119, 127-28 (1st Cir.) (cert. denied, 2021 WL 2519179 (June 21, 2021). Whether an offense satisfies a force clause like the one in 18 U.S.C. § 16(a) depends on the offense's mens rea. See e.g., *Borden* at 1824, *Leocal v. Ashcroft,* U.S. 1, 6 (2004). Offenses that require purposeful or knowing acts qualify, while those that require merely negligent, accidental, or reckless conduct do not. See *Borden* at 1826; *Leocal* at 6. "Malice-aforethought-style recklessness falls somewhere between ordinary recklessness and knowledge on the mens rea

9

spectrum." *Baez-Martinez* at 127. As the Model Penal Code explains, "recklessness that can fairly be assimilated to purpose or knowledge should be treated as murder, whereas less extreme recklessness should be punished as manslaughter." *Id.*, citing Model Penal Code § 210.2(1)(b) cmt. n. 4 (Am. Law. Inst. 1980). Thus, in *Baez-Martinez*, the First Circuit concluded "this heightened recklessness is at least as close to knowledge as it is to ordinary recklessness." *Id.* (citing *United States v. Marrero*, 743 F.3d 389, 401 (3d Cir. 2014) (depraved-heart recklessness "is tantamount to an actual desire to injure or kill").

Although the *Borden* plurality declined to address crimes with mental states between recklessness and knowledge, its reasoning demonstrates why crimes committed with extreme recklessness should satisfy the force clauses such as in 18 U.S.C. § 16(a). As *Borden* explained, "a person who drives his car straight at a reviled neighbor, desiring to hit him," acts purposefully, and therefore uses "physical force against the person of another." *Id.* at 1826. Likewise, a driver who "sees a pedestrian in his path but plows ahead anyway, knowing the car will run him over" acts knowingly, and fits within the force clause. *Id.* at 1827. In contrast, the plurality explained that "a commuter who, late to work, decides to run a red light, and hits a pedestrian whom he did not see" has "consciously disregarded a real risk," but "has not trained his car at the pedestrian understanding he will run him over," and therefore "has not used force 'against' another person in the targeted way" that the force clause requires. *Id.*

But the extreme recklessness required for depraved-heart murder involves something more: "a wanton disregard for human life that is extreme in nature," rising to the level that a jury could infer that the defendant was aware of the serious risk of death or serious bodily harm. See *Baez-Martinez*, 950 F.3d at 127 ("what separates malice aforethought is the 'extreme

indifference to the value of human life.'"). As the First Circuit explained, "the defendant who shoots a gun into a crowded room has acted with malice aforethought precisely because there is a much higher probability – a practical certainty – that injury to another will result." *Id*. In that circumstance, "the defendant certainly must be aware that there are potential victims before he can act with indifference to them." *Id*. As a result, "the defendant who acts in this manner can more fairly be said to have actively employed force (i.e., 'use[d]' force) 'against the person of another.'" *Id*.

Applying the First Circuit's analysis to the scenario envisioned by the *Borden* plurality, imagine that the hypothetical commuter sees a crosswalk crowded with pedestrians, but drives through at full speed, aware of the possibility that he could strike or kill one, but completely indifferent as to whether he does so. See *id*. In this situation, the defendant is aware there are potential victims, and acts with indifference to them. Therefore, he has directed force against the pedestrians, and satisfies the force clause.

In addition, as the First Circuit observed in *Baez-Martinez*, this conclusion both comports with a common sense understanding of the ACCA (and, by implication, § 3559(f)) and reflects the comparative seriousness of murder. 950 F.3d at 127-28. These considerations weigh even more strongly in the § 3559(f)(1) context. That subsection enhances the penalty for murdering children. To nonetheless hold that second degree murder of a child, in violation of § 1111, cannot trigger the application of § 3559(f)(1) enhancement would fly in the face of common sense. See *Borden*, 141 S.Ct. at 1856 n. 21 (Kavanaugh, J., dissenting) (plurality's reticence "to even acknowledge that depraved-heart murder is a violent felony" "shows just how far the plurality's interpretation of this statute has strayed from the statutory text and common sense.").

Second, that approach would allow "the most morally repugnant crime" – murder – to avoid classification as "a crime of violence, while at the same time permitting many less-serious crimes to be so classified." *United States v. Irby*, 858 F.3d 231, 237 (4th Cir. 2017).  Indeed, granting the Defendant's motion would lead to an obvious, illogical result.

        C.      *Second-degree felony murder requires malice aforethought.*

As the Tenth Circuit has observed, second-degree felony murder as "commission of a felony when the crime does not fall under the first-degree murder paragraph of § 1111(a)." *Pearson*, 203 F.3d at 1271, citing Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law, at 606–07 (2d ed.1986). Subsequent Tenth Circuit decisions have interpreted *Pearson* to "suggest[]" the existence of second-degree felony murder. See *United States v. Christie*, 717 F.3d 1156, 1174 (10th Cir. 2013) ("[W]e have suggested that a killing in the course of committing any felony satisfies the malice requirement for second-degree murder."); *United States v. Fortier*, 180 F.3d 1217, 1228 (10th Cir. 1999). With respect to first-degree felony murder, "malice aforethought is proved by commission of the felony, [and] there is no actual intent requirement." *United States v. Barrett*, 797 F.3d 1207, 1221 (10th Cir. 2015).  But, second degree felony murder is different: "[i]n contrast [to first degree felony murder], the 'malice aforethought' that must be established for second-degree murder requires proof of malice with respect to the homicide." *Chanthadara*, 230 F.3d at 1258 (emphasis added). It follows that, for second degree felony murder, malice aforethought is not "proved by commission of the felony" alone.  So, in order to satisfy the second-degree malice aforethought requirement through commission of a felony, *Pearson* must be read narrowly. To satisfy the standard, *Pearson* must be construed "as requiring the predicate felony to be . . . one whose required mens rea would, if

transferred to the homicide, meet the 'malice aforethought' standard." *Christie*, 717 F.3d at 1174; see also 2 Wayne R. LaFave, Substantive Criminal Law, § 14.5(b) (3d ed. 2018).

It is against this landscape that the Defendant makes the claim that second degree murder is not a crime of violence as that term is defined by 18 U.S.C. § 16. In making that case, the Defendant makes no distinction between ordinary and extreme recklessness that was discussed in *United States v. Brown*, 287 F.3d at 975 (10th Cir. 2002) and *United States v. Visinaiz*, 428 F.3d at 1310 (10th Cir. 2005). Despite the warnings issued in *Borden* and ignoring the contrary analysis in *Begay*, 33 F.4th 1081 (9th Cir. 2022), *Kepler*, 2021 U.S. Dist. LEXIS 167737 (N. Dist. Okla., Sept. 3, 2021), and *Janis,* 2022 U.S. Dist. LEXIS 86034 (D.S.D., May 12, 2022), the Defendant insists that recklessness is a one-sized-fits-all mens rea. He is wrong, and this Court should deny his motion.

WHEREFORE, the United States respectfully requests that this Court deny the Defendant's motion.

                            Respectfully submitted,

                            ALEX M.M. UBALLEZ
                            United States Attorney
                            ***Electronically filed on 3/9/23***
                            Jack Burkhead
                            Brittany DuChaussee,
                            Zachary Jones
                            Assistant United States Attorneys
                            P.O. Box 607
                            Albuquerque, New Mexico 87103
                            (505) 346-7274

I hereby certify that on March 9, 2023, I filed
the foregoing electronically through the CM/ECF
System, which caused counsel for the defendant
to be served by electronic means, as more fully
reflected on the Notice of Electronic Filing.

*/s/*
Jack E. Burkhead
Assistant United States Attorney

14